UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

ANGELA GAYLE CAIN                                      PLAINTIFF

V.                      NO. 3:18CV00035-JTR

NANCY A. BERRYHILL,
Deputy Commissioner for Operations,
performing the duties and functions not reserved
to the Commissioner of Social Security                  DEFENDANT

### ORDER

### I.    Introduction:

Plaintiff, Angela Gayle Cain ("Cain"), applied for disability benefits on July 28, 2014, alleging a disability onset date of January 14, 2014. (Tr. at 10). After conducting a hearing, the Administrative Law Judge ("ALJ") denied Cain's application. (Tr. at 23). The Appeals Council denied her request for review. (Tr. at 1). Thus, the ALJ's decision now stands as the final decision of the Commissioner.

For the reasons stated below, the Court[1] reverses the ALJ's decision and remands for further review.

### II.    The Commissioner's Decision:

The ALJ found that Cain had not engaged in substantial gainful activity since January 14, 2014, the date she alleged she became disabled. (Tr. at 12). At Step Two,

---

[1] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge.

the ALJ found that Cain had the following severe impairments: degenerative joint disease, degenerative disc disease, affective disorder, headache, atrial fibrillation, and Chiari malformation. *Id.*

After finding that Cain's impairments did not meet or equal a listed impairment (Tr. at 13), the ALJ determined that Cain had the residual functional capacity ("RFC") to perform a full range of work at the sedentary level, except that: (1) she could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs; (2) she could only occasionally balance, stoop, kneel, crouch, and crawl; (3) she must avoid concentrated exposure to extreme cold, excess vibration, fumes, odors, dust, gases, poor ventilation, and similar irritants; (4) she must avoid hazards such as moving machinery and unprotected heights; and (5) she is limited to simple, repetitive, and routine tasks. (Tr. at 14).

Based on Cain's RFC, the ALJ concluded that she was unable to perform any of her past relevant work. (Tr. at 21). Relying upon the testimony of a Vocational Expert ("VE") at Step Five, the ALJ found that, based on Cain's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that she could perform, including positions as Document Preparer and Callout Operator. (Tr. at 23). Thus, the ALJ held that Cain was not disabled. *Id.*

**III. <u>Discussion</u>:**

    A.   Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

    B.   Cain's Arguments on Appeal

Cain contends that substantial evidence does not support the ALJ's decision to deny benefits. Specifically, she argues that the ALJ erred when he gave no weight to the opinions of Cain's treating physician and the consultative medical examiner, and that the ALJ did not give appropriate consideration to Cain's pain. The Court agrees that the ALJ did not give proper weight to the opinions of the medical professionals.

Cain's most severe problems arose from a car wreck in January 2014, which exacerbated a congenital cervical condition, Chiari 0 malformation.[2] (Tr. at 40, 688). Cain reported severe headaches, dizziness, trouble sleeping, and extreme fatigue. (Tr. at 47-53, 637-640). She reported that she only got one hour of sleep per night. (Tr. at 53). When Cain saw consultative examiner Ziba Monfared, M.D., on March 6, 2015, she was so tired she could not complete the physical examination. (Tr. at 529-543). Several times Dr. Monfared commented on how fatigued, dizzy, and off-balance Cain was at the examination. *Id*. She told him about her blurred vision and problems with memory. *Id*. She had been taking Topomax for headaches for some time. (Tr. at 531).

At the time of Dr. Monfared's examination, Cain did not know what caused her symptoms. But less than 10 days later, on March 14, 2015, she had a brain MRI

---

[2] Chiari malformation is a condition in which the lower part of the brain, called the cerebellar tonsil, herniates down through the skull and into the spinal canal. The herniated tissue blocks the normal flow of cerebrospinal fluid (CSF). Instead of moving in an easy, pulsating movement through this opening, the fluid begins to force its way through – like a water hammer – pushing the tonsils down even farther. The blockage can cause a buildup of fluid in the spinal cord (syringomyelia) or in the brain (hydrocephalus). Chiari is often misdiagnosed because the wide variety of bony and soft tissue problems can cause a wide array of possible symptoms (headache, neck pain, dizziness, arm numbness or weakness, sleep problems, etc.) Headache in the back of the head that worsens with coughing, sneezing, or straining is a hallmark sign. Treatment options depend on the type of Chiari and the severity of symptoms. If symptoms are mild, regular monitoring and medications can be effective. If symptoms are severe or worsening, surgery may be performed to remove a part of the skull bone and create space for the cerebellum and brainstem. An accurate diagnosis and prompt treatment are important to prevent permanent injury to the nervous system. *https://mayfieldclinic.com/pe-chiari.htm*

and a cervical MRI at St. Luke's Neurology Association that revealed the serious Chiari 0 condition. (Tr. at 688-692). The brain MRI showed that Cain's cerebral tonsils extended nearly a centimeter below the caudal lip of the foramen magnum. (Tr. at 688). The cerebral spinal fluid at the foramen was largely effaced. *Id*.

The cervical MRI also showed the cerebral tonsils extending below the foramen magnum, and it revealed craniocervical junction dysfunction. (Tr. at 693). These two MRI studies document Cain's serious condition and explain her debilitating headaches and fatigue. The ALJ asked why Cain had not pursued surgery, and she explained that the surgery would just drill a bigger hole into her skull and may not fully resolve the problem, which is what her doctors told her. (Tr. at 47).

Cain said at the hearing that she got help from family for virtually all activities of daily living, because she was too tired or had severe headaches and pain. (Tr. at 54, 532). The ALJ discredited her testimony because Cain had driven from Texas to Pennsylvania for a funeral (the date of the trip was not discussed). (Tr. at 19). Other than that trip, Cain mostly stayed at home resting and trying to manage her headaches. (Tr. at 51-53).

Roger Cagle, M.D., saw Cain from June 2016 through September 2016, and he documented severe headaches, with nausea, dizziness, and vertigo. (Tr. at 633-

5

646). At her appointments, Cain said that her headaches had started the night before. *Id*. She testified that headaches could last a few hours or a few days. (Tr. at 18, 47-53). Dr. Cagle prescribed oxycodone, gabapentin, and Topomax (he raised her dose from 50 mg to 75 mg on August 1, 2016). (Tr. at 641-642). Cain said the medication helped her function, but the record makes it clear that her pain and fatigue continued to interfere with her life on most days.

Dr. Cagle filled out a medical source statement on October 6, 2016. (Tr. at 647-650). The symptoms he listed that arose from Chiari 0 included nausea, vomiting, photophobia, throbbing pain, mental confusion, inability to concentrate, mood changes, impaired sleep, and avoidance of activity. *Id*. He said she would have 7 headaches a week, lasting from a few hours to a few days.[3] Dr. Cagle said that Cain was incapable of even low stress work, had a poor prognosis, would be off tasks more than 25% of the workday, and would miss more than four days per month of work. *Id*. The ALJ gave Dr. Cagle's opinion no weight. (Tr. at 18).

The ALJ also gave Dr. Monfared's opinion no weight, because Cain could not perform many of the physical tests during the examination. (Tr. at 19). Dr. Monfared reported that Cain could do very few activities of daily living, and that she did not

---

[3] Cain makes the argument that the ALJ misread Dr. Cagle's notes and thought the headaches lasted from 7 am to 3 pm. Any error by the ALJ is immaterial because Cain has proven she has disabling symptoms, with or without that handwritten notation from Dr. Cagle.

make eye contact, spoke in a low voice, and had a flat affect. (Tr. at 533). He assigned a very restrictive ability to perform work activities. (Tr. at 19, 535-539). He said her prognosis was fair. *Id*. Cain told Monfared she was having tests soon to find out what was wrong with her, and indeed, she had MRI testing done within 10 days. (Tr. at 529).

It is the ALJ's function to review all of the medical evidence and resolve conflicts among the various treating and examining physicians. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). A treating physician's opinion must be discussed by the ALJ and, if rejected, reasons are necessary. *Ingram v. Charter*, 107 F. 3d 598, 602 (8th Cir. 1997); Prince v. Bowen, 894 F.2d 283 (8th Cir. 1990). A treating physician's opinion accompanied by medically acceptable clinical or diagnostic data is entitled to controlling weight. *Baker v. Apfel*, 159 F. 3d 1140, 1145-46 (8th Cir. 1998). When supporting clinical and diagnostic data does accompany a treating physician's opinion, it should not be disregarded by the ALJ if the data is consistent with the opinion. *Kelley v. Callahan*, 133 F. 3d 583, 589 (8th Cir. 1998). A specialist's opinion will usually be accorded more weight than non-specialists. *Metz v. Sullivan*, 49 F. 3d 374, 377 (8th Cir. 1995).

The ALJ said he disregarded the opinions of Dr. Cagle and Dr. Monafred

because medications provided some relief and because she was too tired to perform tests at Dr. Monafred's examination. The ALJ also incorrectly stated that Cain had not seen a specialist, when in fact she went to a neurology clinic specifically for her brain malformation. The reasons the ALJ gave for discounting the doctors' opinions were insufficient, in light of objective test results providing convincing explanations for Cain's consistent and severe symptoms.

## IV.  Conclusion:

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477). The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing. The Court finds that the ALJ's decision is not supported by substantial evidence, because the ALJ failed to give appropriate weight to the medical opinions.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is REVERSED and the case is REMANDED for further review.

DATED this 14th day of December, 2018.

_____
UNITED STATES MAGISTRATE JUDGE